IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KENNETH STEVE FULCE,**                     Case Number 3:13cv2245

    Plaintiff,                                   Judge Jeffrey J. Helmick

    v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                   REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Kenneth Steve Fulce seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1) (non-document entry dated October 10, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI on August 25, 2009 alleging disability since April 1, 1995 due to depression, a bullet in the head, groin injury, knee injury, bleeding ulcer, back injury, and inability to read or write. (Tr. 192, 219). His claim was denied initially and on reconsideration. (Tr. 101, 107). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 114). At the hearing Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 35). On April 12, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 16). Plaintiff's request for appeal was denied, making the decision of the ALJ the final decision

of the Commissioner. (Tr. 1, 14); 20 C.F.R. §§ 416.1455, 416.1481. On October 10, 2013, Plaintiff filed the instant case. (Doc. 1).

Previously, Plaintiff was awarded benefits. (Tr. 82). However, his benefits were terminated on July 6, 2004, when a previous ALJ determined Plaintiff was no longer disabled due to medical improvement. (Tr. 82). The instant ALJ did not adopt the previous ALJ's findings because objective evidence supported greater limitations. (Tr. 27-28, 243).

## FACTUAL BACKGROUND

### *Plaintiff's Vocational and Personal Background*

 Born on November 9, 1969, Plaintiff was 39 years old on the date his application was filed. (Tr. 28). He has a ninth grade education, no prior relevant work experience, and attended special education classes in high school. (Tr. 28, 46).

Plaintiff lived alone in a seventh-floor apartment with an elevator. (Tr. 57, 235). Plaintiff's sister cooked and cleaned for Plaintiff and handled his bills. (Tr. 238-39, 256-60). She drove Plaintiff to the store and doctor's appointments because he did not own a car. (Tr. 259). Plaintiff said he did not do laundry because he could not lift the clothes and could not read the instructions on the washer and dryer. (Tr. 58). His sister grocery shopped for him because he could not read labels and she brought him food because he did not cook. (Tr. 58, 237-38).

Plaintiff has two children who lived with their mother. (Tr. 46). Plaintiff testified to going weeks without maintaining personal hygiene due to pain. (Tr. 59, 237). Concerning daily activities, Plaintiff said he watched television all day and drove to his medical appointments twice per week. (Tr. 59-60, 236, 239). He smoked three or four cigarettes per day and said he had not consumed alcohol in over seventeen years and had not smoked marijuana in one year. (Tr. 60-61, 65). From 2006 to 2009, Plaintiff worked three hours per week at a fast food

restaurant where he cooked meat and said special arrangements were made so he did not have to lift boxes or read labels. (Tr. 48-49).

Plaintiff testified several issues kept him from working. He said he could not read, noting he was only able to pass a driver's test when the questions were read to him. (Tr. 46-47, 50). Plaintiff complained of right shoulder pain that would spread down his arm and into his wrist. (Tr. 50-51). He said he could not move his right arm. (Tr. 51). He had pain in his left knee from a bullet wound and said he could not walk long distances or stand. (Tr. 52). However, in a function report, Plaintiff said he walked to exercise his legs and sat outside his building every day. (Tr. 238). Plaintiff also suffered a bullet wound to his head and said he suffered from four headaches per week as a result. (Tr. 52-53). Due to depression, Plaintiff did not like to be around people and said he cried frequently. (Tr. 54). Plaintiff suffered from fatigue because he slept for an hour or less per night. (Tr. 54-55). He described feeling angry when he thought people did not explain things to him. (Tr. 55-56). He testified to having a hard time dealing with his brother's death and said he could not sit in one spot for more than ten minutes due to lower back pain. (Tr. 56). Plaintiff's feet were frostbitten as a child and he claimed to suffer from complications as an adult. (Tr. 57). He said he did not get along with others and had poor abilities to concentrate and remember. (Tr. 64). Plaintiff testified he had a history of suicidal ideation. (Tr. 64).

***Medical Evidence***

Plaintiff's 1978 school records indicate he functioned in the "dull normal" range of general intelligence. (Tr. 316, 319). Testing revealed Plaintiff had a full scale IQ score of 81. (Tr. 319). However, the school psychologist suspected Plaintiff had more potential than one test score indicated because of the quality of some of the responses and his overall test patterns. (Tr. 316).

Plaintiff received a diagnostic assessment at Harbor Behavioral Healthcare ("Harbor") on July 8, 2008. (Tr. 336). He presented with difficulty dealing with the shooting death of his brother and said he could not read, moved up through school without learning, and had difficulty filling out paperwork. (Tr. 336). At the time, Plaintiff worked part-time as a fast food cook and said he would like to work more hours but could not "because of Social Security." (Tr. 337). Following mental status examination, Plaintiff was diagnosed with major depressive disorder and post-traumatic stress disorder ("PTSD"). (Tr. 339-40). The treating social worker recommended Plaintiff receive a psychiatric evaluation and assigned a global assessment of functioning ("GAF") score of 55.[1] (Tr. 340).

On March 9, 2009, he discussed anxiety and depression due to "multiple traumas in his life", learning disabilities, and difficulty sleeping. (Tr. 388). Plaintiff was sketchy regarding his legal and drug histories, but did admit to smoking marijuana daily. (Tr. 388). He said he had not had alcohol for five or six years. (Tr. 388). At a medication management appointment, Plaintiff said Celexa helped him feel calmer and sleep better, but would sometimes cause drowsiness. (Tr. 392, 398). Plaintiff was smoking less marijuana at the time. (Tr. 392).

Plaintiff continued to treat at Harbor through March 1, 2012. (Tr. 384-400, 438-59, 639-82). Throughout his treatment, Plaintiff was routinely assigned a GAF score of 55.[2] (Tr. 391, 393, 396, 399, 442, 444). When his primary care physician placed him on Cozaar for hypertension, Plaintiff reported difficulty sleeping because he had to use the bathroom

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.
2. *DSM-IV-TR*, *supra*, note 1.

frequently. (Tr. 441). On February 22, 2010, the treating psychiatrist indicated Plaintiff continued to smoke marijuana against her advice, which made her uncomfortable with prescribing a higher dose of Celexa. (Tr. 441).

At times, during Plaintiff's medication management appointments at Harbor in 2011 and early 2012, Plaintiff reported that he was feeling better overall with medication and was described as talkative and bright. (Tr. 643, 646, 648, 653, 662, 665, 671, 677). In addition, he denied the use of alcohol or drugs. (*Id.*). However, at other times, Plaintiff's depression and anxiety overwhelmed him. (Tr. 650, 655, 662, 675). On September 27, 2011 and February 28, 2012, the treatment provider indicated Plaintiff had not been compliant with medication, in part because he said he could not afford it. (Tr. 640, 659).

On June 28, 2011, Plaintiff was tearful over the loss of his brother, financial difficulty, and lack of communication with his lawyer. (Tr. 669). On July 11, 2011, Plaintiff expressed frustration with his daughter's level of pneumonia care and said he dealt with that frustration by cussing out the staff. (Tr. 667). On November 22, 2011, Plaintiff was upset because he had not heard from his attorney in over a year. (Tr. 657). With Plaintiff's permission, the treatment provider called the attorney's office. (Tr. 657). On February 13, 2012, Plaintiff said he was recently pulled over by the police. (Tr. 643).

On October 6 and 13, 2008, Jon H. Pansky, Ph.D., administered a psychological evaluation. (Tr. 332). Plaintiff was late for the first appointment due to transportation difficulties and arrived on time for the second. (Tr. 332). Plaintiff appeared casually dressed with fair grooming, long fingernails, and poor dentition. (Tr. 332). During testing, Plaintiff responded to questions in a manner ranging from cooperative to irritated and verbally combative. (Tr. 332). His eye contact was varied, mood depressed, and attitude rather negative and self-defeating. (Tr.

332). Plaintiff said he smoked marijuana on a near daily basis to relax and ease stress. (Tr. 332). Plaintiff exhibited a full scale IQ of 52, placing him within the mild to moderate range of mental retardation or extremely low range of intellectual functioning. (Tr. 333-34). However, Dr. Panskey considered the results "provisional at best, given the concurrent contributors to his functioning and approach to the testing --- the marijuana useage; reported blurred vision at times; the bullet in his head; and his obvious [d]epression." (Tr. 334).

On August 26, 2009, a field office disability examiner interviewed Plaintiff and noted he had difficulty hearing and answering questions, frequently got off subject, asked the interviewer personal questions, and had rotting or missing teeth, long fingernails, and trouble making eye contact. (Tr. 216).

Plaintiff treated at the Center for Health Services from June 5, 2006 through January 26, 2011. (Tr. 356-72, 467-526, 615-19). At times, Plaintiff complained of knee and groin pain. (Tr. 366-72, 608). A March 11, 2008 x-ray of Plaintiff's left knee revealed metallic foreign bodies and no acute osseous abnormality and he tested negative for HIV. (Tr. 366-72, 608). Plaintiff said Ibuprofen helped his knee pain, his hours at the fast food restaurant were cut when a new manager took over, and he continued to smoke cigarettes and marijuana. (Tr. 364).

In addition, Plaintiff complained of right wrist pain from flipping burgers; however, a January 15, 2009 x-ray revealed no acute osseous or articular abnormalities. (Tr. 357, 359-61, 606).

Further, Plaintiff complained of headaches possibly related to a bullet in his head; a January 25, 2009 CT scan revealed a small metallic slug but no acute findings, including no mass, shift, hemorrhage, or hydrocephalus. (Tr. 356, 358, 604, 636).

With respect to claims of back and shoulder pain, November 30, 2009 x-rays of Plaintiff's cervical and lumbar spine were negative. (Tr. 500, 634). Moreover, a November 13, 2009, x-ray of Plaintiff's right shoulder was unremarkable. (Tr. 504, 635). On February 10, 2009, Plaintiff attempted to undergo an EMG due to left arm parethesias and right arm pain and weakness. (Tr. 377, 621). However, Plaintiff said the testing was too uncomfortable to proceed and the test was suspended resulting in too little data to make a firm diagnostic decision. (Tr. 377, 621). In November, 2009, Ann Murawski, CNP[3], reported Plaintiff moved all extremities on command and randomly. (Tr. 502).

Plaintiff began physical therapy to reduce shoulder pain on December 9, 2009. (Tr. 460). He attended eight out of eight sessions, during which he had poor motivation and fear that his shoulder would dislocate. (Tr. 461).

Plaintiff continued to treat for hypertension, vitamin D deficiency, major depression, and right shoulder immobility at the Center for Health Services. (Tr. 476). On January 25, 2010, Plaintiff continued to complain of back and right shoulder pain. (Tr. 489). Gerald W. Sutherland, M.D., recommended Plaintiff be reassessed in the Ortho Clinic. (Tr. 490). Plaintiff also complained of foot pain and peeling, which he suspected was related to childhood frost bite. (Tr. 489-90). Dr. Sutherland's impression was for a fungal infection, and he instructed Plaintiff to go to the podiatry clinic immediately. (Tr. 490).

At the podiatry clinic, Plaintiff was diagnosed with hammer digit syndrome with associated keratoma at the right third and right second digits and onychomyscosis bilaterally. (Tr. 488). The podiatrist recommended Plaintiff use routine hygiene measures to maintain nails at a comfortable level and follow-up as needed. (Tr. 488).

---

3. The ALJ spelled Nurse Murawski's name "Murkuski". (Tr. 27). Upon review of the record, however, the Court concludes "Murawski" is the proper spelling. (Tr. 502).

On February 11, 2010, Nurse Murawski, of the Center for Health Services, commented on Plaintiff's functional ability. (Tr. 529-30). She said Plaintiff could stand or walk for up to two hours in an eight-hour workday and for up to thirty minutes without interruption, sit for twenty minutes in an eight-hour workday, and could not lift or carry any weight. (Tr. 530). He was extremely limited in abilities to push, pull, and reach; markedly limited in abilities to bend and handle; moderately limited in ability to perform repetitive foot movements; and not significantly limited in abilities to see, hear, or speak. (Tr. 530). Nurse Murawski determined Plaintiff was unemployable and said he was not dependent on medication. (Tr. 530-31).

On February 12, 2010, Dr. Sutherland examined Plaintiff and noted his resistance to moving his right shoulder. (Tr. 480-81). Dr. Sutherland had Plaintiff remove his shirt and found it "difficult to understand how somebody, who could have had a shoulder dislocation from 1995 secondary to a basketball injury could have such a good deltoid development at the present time". (Tr. 480). Dr. Sutherland referred Plaintiff to physical therapy. (Tr. 481). A second x-ray of Plaintiff's right shoulder revealed no acute fracture or dislocation. (Tr. 485, 633).

On April 13, 2010, Nurse Murawski recommended Plaintiff return to physical therapy and stressed the importance of taking his blood pressure medication daily. (Tr. 476-77). Nurse Murawski examined Plaintiff and said he had a full range of motion in all extremities and no sensory or motor deficits were appreciated, except in his right shoulder. (Tr. 477).

On April 23, 2010, diagnostic imaging of Plaintiff's cervical spine revealed no acute findings and only early degenerative disease. (Tr. 599).

On May 21, 2010, Dr. Sutherland expressed concern that Plaintiff would never regain range of motion in his shoulder since he had not had active motion there for thirteen years. (Tr.

619). However, he said surgery was not indicated and recommended a second period of physical therapy. (Tr. 619).

Plaintiff resumed physical therapy on June 7, 2010. (Tr. 542-56). However, he was discharged on July 2, 2010 after completing nine out of twelve scheduled sessions because he was very fearful his shoulder would dislocate and would not allow passive or active assistance or range of motion testing. (Tr. 539-40).

***State Agency Review and Examination***

Consultative examiner Sushil M. Sethi, M.D., examined Plaintiff on November 6, 2008. (Tr. 342). Dr. Sethi noted Plaintiff's fourteen-year-old knee injury and depression. (Tr. 342). He said Plaintiff enjoyed comedy shows on television, could not (and did not want to) read, and was able to cook, wash, and clean without assistance. (Tr. 342). Plaintiff said he smoked one pack of cigarettes per day and drank and average of twelve beers per day. (Tr. 343). He complained of arthritic pain in his knees and neck. (Tr. 343). Following a generally normal physical examination and review of an unremarkable right shoulder x-ray, Dr. Sethi concluded Plaintiff had a slightly limited ability to do work-related activities such as sitting, standing, walking, lifting, and carrying and handling objects. (Tr. 343-48). He had a normal ability to hear, speak, and travel. (Tr. 344).

Consultative examiner James C. Tanley, Ph.D., examined Plaintiff on November 11, 2008. (Tr. 350). Plaintiff described pain in his shoulder and knee, depression, chest pain, becoming frustrated quickly, a limited education, and community problems including smoking marijuana and cigarettes and drinking every day – either a bottle "if [he could] get it" or twelve cans of beer. (Tr. 350). Plaintiff's mental status examination was unremarkable aside from a bland affect, variable eye contact, and slight appearance. (Tr. 351). Testing placed Plaintiff's

cognitive efforts in a range from borderline to mentally retarded, with most results in the mentally retarded range. (Tr. 351). Similarly, Plaintiff's functional intelligence was in the mild range of mental retardation, and his memory testing was squarely within the extremely low range. (Tr. 352). Plaintiff had a full scale IQ of 50. (Tr. 352).

Importantly, Dr. Tanley found no reported intervening event or series of events to account for test results that were dramatically lower than those of the 1978 school evaluation, and therefore, he used the 1978 evaluation to diagnose borderline intellectual functioning. (Tr. 353). Dr. Tanley concluded Plaintiff had an unimpaired ability to relate to others; moderately impaired abilities to maintain attention, concentration, persistence, and pace and withstand the stress and pressure of daily work; and could understand and complete simple, routine activities of daily living at home and in the community. (Tr. 353). Dr. Tanley diagnosed adjustment disorder with depressed mood and assigned a GAF score of 60.[4] (Tr. 353).

On October 23, 2009, state agency reviewing physician John Waddell, Ph.D., reviewed Plaintiff's records and completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment. (Tr. 402, 416). He found Plaintiff was moderately or mildly limited in mental functioning due to a reading disorder, depression, borderline intellectual functioning, personality disorder, and polysubstance abuse. (Tr. 403-12). Dr. Waddell concluded Plaintiff was capable of simple, routine tasks without strict deadlines or quotas and occasional brief interactions with reading and writing not being essential to the job. (Tr. 418). On August 23, 2010, T. Finnerty, Psy.D., affirmed Dr. Waddel's findings as written. (Tr. 528).

On December 17, 2009, Plaintiff described to Dr. Sethi a history of pain in his head and right arm and hypertension. (Tr. 421). He said he smoked one pack of cigarettes per day and

---

4. *DSM-IV-TR*, *supra*, note 1.

drank "all the alcohol he [could] get". (Tr. 422). Plaintiff guarded his right shoulder and would not allow Dr. Sethi to passively test his range of motion. (Tr. 423). Dr. Sethi again concluded Plaintiff's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, and handling objects was minimally limited and he had a normal ability to hear, speak, and travel. (Tr. 424).

State agency reviewing physician A. Przybyla, M.D., reviewed Plaintiff's records and made a physical RFC assessment on January 22, 2010, concluding Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for up to six hours in an eight-hour workday; push and/or pull with some limitation; and occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 429-36). On August 10, 2010, Carl Leigh, M.D., affirmed Dr. Pryzbyla's findings as written. (Tr. 527).

***ALJ Decision***

On April 12, 2012, the ALJ determined Plaintiff had severe impairments of borderline intellectual functioning, reading disorder, adjustment disorder, PTSD, polysubstance abuse, status-post right shoulder dislocation, and status-post bullet injury to head and left lower extremity. (Tr. 21). The ALJ found these impairments alone and in combination did not meet or medically equal a listed impairment. (Tr. 21-23).

Next, the ALJ determined Plaintiff had the RFC to perform a range of light work restricted to no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling. (Tr. 23). In addition, Plaintiff could not use his dominant right upper extremity for more than occasional pushing, pulling, reaching, or overhead reaching or use his left lower extremity for more than occasional pushing, pulling, or operation of foot controls. (Tr. 23). Further, Plaintiff must avoid all exposure to unprotected heights and hazardous machinery and

was limited to work that involved simple, routine, and repetitive tasks in a work environment free of fast paced production requirements and involving only simple, work-related decisions, with few, if any, work place changes and any such changes being gradually introduced, and must be consistent with functional illiteracy. (Tr. 23). Moreover, Plaintiff required no more than occasional and brief interaction with the public, co-workers, and supervisors. (Tr. 23). Based on Plaintiff's age, education, work experience, and RFC, the ALJ concluded Plaintiff could perform work as a housekeeping cleaner, garment sorter, and gate attendant; therefore, he was not disabled. (Tr. 28-29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a).

12

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

***Nurse Murawski***

First, the Court addresses Plaintiff's argument that the ALJ did not adequately consider Nurse Murawski's opinion. (Doc. 14, at 20-22; Doc. 16, at 9-10). Here, Nurse Murawski is classified as an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1).

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of

analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

Here, Nurse Murawski opined on February 11, 2010 that Plaintiff could stand or walk for up to two hours and for up to thirty minutes without interruption in an eight-hour workday, sit for twenty minutes in an eight-hour workday, and could not lift or carry any weight. (Tr. 530). She said Plaintiff was extremely limited in abilities to push, pull, and reach; markedly limited in abilities to bend and handle; moderately limited in ability to perform repetitive foot movements; and not significantly limited in abilities to see, hear, or speak. (Tr. 530).

Upon review, not only did the ALJ "consider" Nurse Murawski's opinion, he afforded it little weight. (Tr. 27). In doing so, the ALJ pointed out that Nurse Murawski was not an acceptable source. (Tr. 27). Indeed, as previously stated, Nurse Murawski is classified as an "other source" by the regulations. 20 C.F.R. § 404.1513(d)(1). Plaintiff takes issue with this finding because as a person of limited means, Plaintiff could not choose his medical treatment. (Doc. 16, at 9). Plaintiff also suggests a certified nurse practitioner should be entitled to more weight. *Id*. Third, he argues Nurse Murawski had a longitudal history of treating Plaintiff. *Id*. However, these arguments do not result in error where the ALJ's conclusion that Nurse Murawski was an "other source" is consistent with the black letter of the Code.

Moreover, the ALJ did not end his discussion of Nurse Murawski's opinion there. Rather, the ALJ explained Nurse Murawski's opinion was "virtually devoid of objective findings". (Tr. 27). Despite Plaintiff's argument, the fact Nurse Murawski took Plaintiff's vitals before filling out the form does not establish error. Plaintiff's vital signs do not support the extreme functional limitations set forth in the opinion. Indeed, as the ALJ said, the opinion is "virtually devoid of objective findings." (Tr. 27).

Additionally, the ALJ said the opinion was "inconsistent with contemporaneously prepared examination reports, and inconsistent even with portions of the claimant's own testimony." (Tr. 27). This finding is supported by substantial evidence.

To this end, at the hearing, Plaintiff said his knee only hurt when he walked a long distance or stood. (Tr. 52). Moreover, in a function report, Plaintiff said he walked to exercise his legs and sat outside his building every day. (Tr. 238).

In 2010, shortly after she authored her restrictive opinion, Nurse Murawski examined Plaintiff and said he had a full range of motion in all extremities and no sensory or motor deficits, except in his right shoulder. (Tr. 477). And, only weeks after Nurse Murawski's opinion, Dr. Sutherland questioned Plaintiff's claims that he could not move his shoulder at all, finding it "difficult to understand how somebody, who could have had a shoulder dislocation from 1995 secondary to a basketball injury could have such a good deltoid development at the present time". (Tr. 26, 480).

Additionally, as the ALJ recalled, Plaintiff did not complain of shoulder pain at a 2008 consultative examination, despite his claims it had been dislocated for fourteen years. (Tr. 25-26, 342). In November 2009, Nurse Murawski reported Plaintiff moved all extremities on command and randomly. (Tr. 26, 502). At physical therapy, Plaintiff was described as self-limiting, poorly motivated, guarded, and unwilling to engage in physical therapy. (Tr. 26, 461, 539-40). Further, state agency review physician Dr. Przybyla reviewed Plaintiff's records and determined he could stand, walk, or sit for up to six hours in an eight-hour workday. (Tr. 429-36). Consultative examiner Dr. Sethi examined Plaintiff and concluded he was only slightly limited in ability to do work-related activities, including sit, stand, walk, lift, carry, and handle. (Tr. 343-48). Additionally, numerous objective tests performed by the Center for Health Services (where

Nurse Murawski worked) were unremarkable, including x-rays of Plaintiff's knee (Tr. 608), wrist (Tr. 606), cervical spine (Tr. 599, 634), lumbar spine (Tr. 634), and right shoulder (Tr. 633, 635).

Also, the ALJ pointed out Nurse Murawski's opinion was a checkbox form. (Tr. 27). This observation was not error. *Hyson v. Comm'r of Soc. Sec.*, 2013 WL 2456378, at *13 (N.D. Ohio 2013) (collecting cases that held the ALJ does not err by discounting a physician's opinion which used a checkbox form unaccompanied by explanation of her conclusions).

In short, not only did the ALJ consider Nurse Murawski's opinion, but he provided good reasons to afford the opinion little weight, namely that it was internally unsupported, inconsistent with the record as a whole, and authored by an "other source" under the regulations. Moreover, the ALJ's conclusion is supported by substantial evidence. For these reasons, the ALJ did not err in his treatment of Nurse Murawski's opinion.

### RFC and Step Five

Several of Plaintiff's arguments center around Plaintiff's literacy, reasoning level, and mental capacity as incorporated into the RFC determination and step five hypothetical. Specifically, he claims the following: the ALJ erred by finding Plaintiff had a limited education and adopting an RFC (and corresponding step five hypothetical) which found Plaintiff was functionally illiterate (Doc. 14, at 12); it was unclear to the VE which education level the ALJ meant to include in the hypothetical questions (Doc. 14, at 13, 15); the ALJ should have categorized Plaintiff as illiterate, not functionally illiterate (Doc. 14, at 13, 15); the jobs identified by the VE could not be performed by someone who was functionally illiterate (Doc. 14, at 13-14); the ALJ erred by not eliciting an explanation for the conflict between VE testimony and Dictionary of Occupational Titles ("DOT") reading requirements and when

Plaintiff sought an explanation, the VE's answer was insufficient (Doc. 14, at 14-15); the ALJ and/or VE erred with respect to the VE's discussion of reasoning levels for the identified positions (Doc. 14, at 14-16); the VE had no specific formula to support his numbers for available jobs (Doc. 14, at 16); because the ALJ's hypothetical was unclear, the wrong grid rule was used as a starting point (Doc. 14, at 18); and, the ALJ ignored SSR 85-15 and SSR 96-6p. (Doc. 14, at 18-20).

*Mental RFC Finding*

Plaintiff generally claims the ALJ did not adequately consider Plaintiff's mental impairments, including reasoning ability, illiteracy, a bullet in his brain, possible organic brain disorder, substance abuse, and low full scale IQ scores. In his decision, the ALJ determined that despite Plaintiff's impairments, he remained capable of performing light work that was simple, routine, and repetitive in a work environment free of fast paced production requirements, involving only simple, work-related decisions, with few, if any, work place changes and any such changes being gradually introduced. (Tr. 23). In addition, the ALJ limited Plaintiff to work that required no more than occasional and brief interaction with the public, co-workers, or supervisors and work that was consistent with functional illiteracy. (Tr. 23). Because substantial evidence supports the ALJ's conclusion, the undersigned recommends the Court affirm his RFC finding.

In his opinion, the ALJ found Plaintiff had a mild restriction in activities of daily living, pointing to evidence he lived independently and was able to cook, wash, and clean without assistance. (Tr. 22, 343). As the ALJ recalled, Plaintiff testified he could drive and follow directions. (Tr. 22, 47, 50, 59).

The ALJ discussed consistent GAF scores indicative of no more than moderate functional limitations. (Tr. 25, 340, 353, 391, 393, 396, 399, 442, 444). The ALJ also considered Plaintiff's more recent records, which indicated he had not been taking his medication consistently even though he did not report adverse side effects, his concentration and memory were intact, he denied hallucinations, and his medications, when taken, improved his condition. (Tr. 25, 640, 643, 646, 648, 653, 659, 662, 665, 671, 677). Affording Plaintiff the benefit of the doubt, the ALJ considered Plaintiff's adjustment disorder and PTSD in light of his reading disorder and borderline intellectual functioning to conclude Plaintiff was limited to work that was simple, routine, and repetitive in a low stress work environment with limited interpersonal interaction. (Tr. 25).

The ALJ also considered the bullet in Plaintiff's head. (Tr. 26, 356, 358, 604, 636). The ALJ reasoned that although the record confirmed the existence of the bullet, the record demonstrated it had little effect on Plaintiff's functional capacity to work. (Tr. 26). Indeed, a CT scan revealed no acute findings, including no mass, shift, hemorrhage, or hydrocephalus. (Tr. 356, 358, 604, 636).

With respect to credibility, the ALJ pointed to Plaintiff's inconsistent statements. (Tr. 26). Namely, at one time, Plaintiff indicated he worked part-time due to his inability to read but later, he said it was his desire to receive social security benefits that accounted for his limited work activity. (Tr. 26, 49, 337).

The ALJ found Plaintiff had moderate difficulties with regard to concentration, persistence, or pace based on Plaintiff's testimony as corroborated by the findings of the psychological consultative examiner and state agency medical consultants. (Tr. 22, 353, 403-12).

However, the ALJ added that Plaintiff demonstrated intact attention and concentration on examination and was able to successfully complete standardized intelligence tests. (Tr. 22-23).

The ALJ considered opinion evidence of record, affording significant weight to Dr. Tanley's opinion and the state agency medical and psychological consultants' opinions. (Tr. 27). The ALJ incorporated their restrictions on Plaintiff's ability to maintain attention, withstand the stress and pressure of daily work, and engage in only simple, routine, and repetitive tasks without fast pace or strict production requirements, with only occasional and brief interpersonal interactions, and not including reading or writing as an essential part of the job. (Tr. 27). As support, the ALJ reasoned Drs. Tanley and Suthi examined Plaintiff, the opinions were made within the doctors' respective areas of practice, the opinions were consistent with the record as a whole, and the opinions were un-contradicted by any acceptable, treating or examining medical source. These are good reasons, and also support the ALJ's mental RFC finding. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Contrary to Plaintiff's argument, the ALJ did not violate SSR 96-6p by failing to properly compare the opinion evidence with the record. (Doc. 14, at 19). Further, as stated above, the ALJ also adequately considered Nurse Murawski's opinion.

Contrary to Plaintiff's argument invoking SSR 96-6p, the ALJ did not fail to compare separate IQ scores as part of the RFC formulation. (Doc. 14, at 19-20). Rather, the ALJ reported Plaintiff achieved two valid full scale IQ scores of 77 and 81. (Tr. 23, 24, 319, 352). Contrasting these with lower scores, the ALJ wrote, "[a]lthough he has scored in the mental retardation range on two subsequent IQ tests, neither of these scores is considered valid." (Tr. 23, 333-34, 352). To this end, as the ALJ recalled, because there was no intervening reason for Plaintiff's dramatically lower test scores, Dr. Tanley accepted Plaintiff's 1978 IQ score and diagnosed borderline

intellectual functioning rather than mental retardation. (Tr. 23, 24, 353). In addition, Dr. Panskey indicated the low IQ results must be considered "provisional at best" in light of various factors potentially affective of the testing outcome, including Plaintiff's substance abuse. (Tr. 23, 24, 334). Plaintiff disagrees with the ALJ's finding that no medical or psychological source had opined Plaintiff was mentally retarded, pointing to testing which placed him in the mild mental retardation range. (Doc. 16, at 8). However, this argument requires little discussion, because the administrators discredited the results and did not diagnosis mental retardation. (Tr. 334, 353).

Plaintiff argues Dr. Tanley did not consider Plaintiff's years of substance abuse. (Doc. 14, at 20). However, this would not amount to reversible error on the part of the ALJ. Even still, the ALJ considered Plaintiff's substance abuse, writing, "[u]nfortunately, the record reveals that the claimant has struggled with substance abuse for many years" then proceeding to detail the relevant evidence of record. (Tr. 25).

In sum, the ALJ's RFC determination, and specifically his mental RFC determination, is supported by substantial evidence, including the treatment evidence of record, Plaintiff's testimony, Plaintiff's credibility, and opinion evidence. Importantly, the Court is guided by the standard of review in this case, which instructs that even if substantial evidence supports a claimant's position, the court cannot over turn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

Plaintiff claims the ALJ ignored SSR 83-15, which advises "[a] substantial loss of ability to meet . . . basic work-related activities would severely limit the potential occupational base." (Doc. 14, at 18). In this case, the ALJ thoroughly considered the evidence of record, but found the occupational base was not so severely limited as to preclude Plaintiff from engaging in light work. By supporting his conclusions with substantial evidence, the ALJ did not err under SSR

83-15. Therefore, and for the reasons stated above, the undersigned recommends the Court affirm the ALJ's RFC conclusion.

*Education Determination*

Next, Plaintiff argues the ALJ's education determination is fatally inconsistent with the ALJ's RFC finding and corresponding step five hypothetical question. In addition, Plaintiff takes issue with the VE's reliance on the improper education level.

Here, the ALJ determined Plaintiff had a limited education. (Tr. 28). Under 20 C.F.R. § 416.964(b)(3), the Social Security Agency considers a seventh through eleventh grade level of formal education a "limited education". Plaintiff testified he completed ninth grade. (Tr. 46). Under the regulations, this is consistent with a ninth grade education. Therefore, the education determination was not error.

It is true Plaintiff testified he attended special education classes and could not read. (Tr. 46-47). However, the ALJ accounted for Plaintiff's intellectual difficulties in the RFC by limiting Plaintiff to work that was simple, routine, and repetitive in nature and consistent with functional illiteracy. (Tr. 23). The ALJ noted in his decision that Plaintiff had been in special education classes, said he could not read and moved up through school without learning, and had a reading disorder. (Tr. 24). He recalled Plaintiff's documented full scale IQ scores between 52 and 81 in the record, but noted Drs. Tanley and Panskey's questioning of the validity of the lower scores. (Tr. 25). The ALJ noted Plaintiff's diagnosis of borderline intellectual functioning (rather than mental retardation) and the fact no treating medical or psychological source had opined Plaintiff operated below that range. (Tr. 25). Accordingly, by precluding Plaintiff from work which he would otherwise be capable of in light of his limited education, the ALJ did not commit reversible error.

Plaintiff's reliance on *Skinner v. Sec'y of Health and Human Servs.*, 902 F.2d 447, 450-51 (6th Cir. 1990) is not instructive given the facts of this case. (Doc. 14, at 13; Doc. 16, at 1). In *Skinner*, the claimant was approaching advanced age. The ALJ discounted numerous pieces of evidence, which showed the claimant was functionally illiterate, in favor of deferring to Plaintiff's grade level education at step five (in formulating a hypothetical to pose to the VE). Because of his age and illiteracy, the court held the claimant was disabled under the grids. *Id*.

Unlike in *Skinner*, the ALJ in this case limited Plaintiff to work consistent with someone who was functionally illiterate – both in the RFC and in the hypothetical posed to the VE – despite the fact Plaintiff had achieved a ninth grade education. Moreover, Plaintiff was a younger individual. (Tr. 28). Accordingly, the ALJ did not err under *Skinner*.

With respect to Plaintiff's argument that the education determination was incorrectly or unclearly presented to the VE, that argument is also without merit. At the hearing, in the presence of the VE, Plaintiff testified he had a ninth grade education, attended special classes, and could not read. (Tr. 46-47). The ALJ asked the VE to consider a hypothetical person of the same age, education, and work experience as Plaintiff, but who was capable of a range of medium work and subject to certain mental limitations, including work consistent with someone who was functionally illiterate. (Tr. 67-68). The VE found such an individual could perform work in the national and local economies. (Tr. 68-69). The ALJ then modified the first hypothetical, describing a person of Plaintiff's same age and education, subject to the same abilities and limitations set forth in the first hypothetical but this time, limited to a range of light exertional work. (Tr. 69). The VE responded again that such an individual could perform work in the national and local economies. (Tr. 69-70). Simply stated, it is clear the second hypothetical

person was limited to work consistent with functional illiteracy. Additionally, the VE considered Plaintiff's testimony regarding his special education background and reading difficulty.

Moreover, it was not until his decision after the hearing that the ALJ found Plaintiff had a "limited education". (Tr. 28). Thus, any "inconsistency" between functional illiteracy and limited education could not have tainted VE testimony.

In conclusion, Plaintiff's arguments regarding his education level are not well-taken because: 1) the RFC limited Plaintiff to work consistent with functional illiteracy; and 2) the VE's testimony was based on a clear and accurate description of Plaintiff's educational abilities as established at the hearing.

*Step Five*

Plaintiff's remaining arguments challenge the ALJ's step five determination. First, Plaintiff argues the reasoning level for the identified jobs preclude performance by someone who was functionally illiterate. Relatedly, Plaintiff argues the ALJ failed to explain purported conflict between relevant reasoning levels and the DOT and when asked about the same, the VE did not provide Plaintiff with an adequate explanation.

SSR 00-4p imposes on ALJs "an affirmative responsibility to ask about any potential conflict between that VE . . . evidence and information provided in the DOT." SSR 00-4P, 2000 WL 1898704, *4. The ALJ must ask the VE if his evidence conflicts with the DOT, and if the VE's evidence appears to conflict, the ALJ must obtain a reasonable explanation for the apparent conflict. *Id.* When the VE's evidence conflicts with the DOT, the ALJ "must resolve this conflict before relying on the VE". *Id.*

In *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006), the court considered a challenge that the DOT conflicted with the VE's testimony. There, the ALJ asked if

there was a conflict and the VE testified there was not. *Id.* As it turned out, there actually was a conflict, but the plaintiff had not brought the discrepancy to the ALJ's attention. *Id.* Holding the ALJ had not erred, the court stated:

> Consistent with the SSR 00-4p, the ALJ asked if there was a conflict. The vocational expert testified that there was not. [The plaintiff] did not bring the vocational expert's mistake to the ALJ's attention. Nothing in SSR 00-4p places an affirmative duty on the ALJ to conduct independent investigation of the testimony of witnesses to determine if they are correct.

*Id.* (internal citations omitted).

The Sixth Circuit and Northern District of Ohio have consistently applied the rule that an ALJ need not conduct his own investigation into a VE's testimony to determine its accuracy where the ALJ asked the VE if his testimony was consistent with the *DOT*, the VE answered affirmatively, and the plaintiff failed to bring any conflict to the ALJ's attention. *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Langford v. Astrue*, 2010 WL 3069571, *6 (N.D. Ohio 2010); *Stern v. Comm'r of Soc. Sec.*, 2011 WL 6780889, *6 (N.D. Ohio 2011), *adopted by* 2011 WL 67800883; *Heffelfinger v. Astrue*, 2012 WL 1004722, *7–8 (N.D. Ohio 2012); *Mataraza v. Astrue*, 2012 WL 5996072, *9–10 (N.D. Ohio 2012), *adopted by* 2012 WL 5995987). Instructive here, *Langford* involved a plaintiff arguing the jobs cited by the VE required capabilities beyond those the ALJ listed in the hypothetical, but the court held her argument failed even if she were correct regarding the existence of a conflict, because she had not brought the conflict to the ALJ's attention. *Langford*, 2010 WL 3069571 at *6. "Where the ALJ questions the VE and the VE testifies . . . there is no conflict with the DOT, . . . the ALJ is under no further obligation to interrogate the VE, especially where the plaintiff is afforded a full opportunity to cross-examine the VE." *Heffelfinger*, 2012 WL 1004722 at *7.

Here, the ALJ asked whether the VE's testimony was consistent with the DOT. (Tr. 70). The VE answered it was. (Tr. 70). Plaintiff's counsel questioned the VE about the reasoning level required for the relevant positions and whether the relevant positions could be performed by someone who was illiterate with the ability to do second grade math. (Tr. 74-75). The VE said the jobs could be performed by someone who was illiterate, with a second grade math ability. *Id*. When asked by Plaintiff's counsel, the VE identified the relevant jobs at a reasoning level of 2, and said the DOT is a framework and requires the VE's clinical judgment. (Tr. 74-75). Plaintiff then advocated that Plaintiff's functional ability precluded him from doing work with a reasoning level of two. (Tr. 76-77). However, Plaintiff had not notified the ALJ of any conflict between VE testimony and the DOT. Therefore, the ALJ did not err by relying on VE testimony under SSR 00-4p. *Martin*, 170 F. App'x at 374.

Moreover, despite its best and most labored efforts, the Court has been unable to find any actual conflict raised in Plaintiff's briefs or identified at the hearing between VE testimony and the DOT. While Plaintiff devotes substantial portions of his argument describing what should be done if a conflict between VE testimony and the DOT is identified to the ALJ, he does not make clear that such a conflict was ever identified, or even actually exists. When a plaintiff fails "to offer any particularized argument to support h[is] assertion", the court will not devise arguments on his behalf. *Funk v. Astrue*, 2012 WL 1095918, *3 (N.D. Ohio 2012) (quoting *Merida v. Astrue*, 737 F. Supp. 2d 674, 679 n.2 (E.D. Ky. 2010)).

Plaintiff takes issue with the fact the VE had to look up the relevant reasoning levels. This claim is neither legally cognizable nor persuasive. To the extent Plaintiff argues the VE had a general duty to be aware of existence of the DOT's trailers, that argument is not well-taken; both because review of the transcript does not support such an argument and because Plaintiff

26

has provided no persuasive legal support for this proposition. Moreover, neither the VE nor the ALJ are "bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008) (quoting *Wright*, 321 F.3d at 616)).

Next, Plaintiff claims the ALJ erred by accepting the VE's employment numbers given the VE's failure to account for his methodology.

To meet his burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do")). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ posed to the VE a hypothetical question that fairly and accurately portrayed Plaintiff's limitations. (Tr. 67-70). The VE testified his findings were consistent with the DOT and said he relied on the Bureau of Labor and Statistics, the Economic Research

Institute, and his clinical judgment. (Tr. 71, 73-74). Simply stated, the ALJ was justified in relying on VE testimony. *Varley*, 820 F.2d at 779.

Next, Plaintiff argues the ALJ used the improper medical-vocational guideline as a framework for decision making (also known as the grids). (Doc. 14, at 17-18). Plaintiff re-argues that the ALJ's education finding and RFC were inconsistent, then surmises, "[t]hus, Grid Rule used is also wrong, but no Grid Rule for younger individual at light work produced conclusion of 'disabled'. Framework for Decisionmaking rule, *must however, start from the proper premise.*". (Doc. 14, at 18). As stated above, the Court finds no error in the ALJ's education finding, RFC, or VE testimony. Accordingly, Plaintiff's argument, which is premised on finding such error, is not well-taken.[5]

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the undersigned recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).

---

[5] Alternative:
Unfortunately, Plaintiff's use of italics does not clear up what is an otherwise unintelligible argument. So, Plaintiff's argument, *to the extent it is a cognizable argument at all*, is not well-taken.